## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VLADIMIR PAVLOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22-cv-4270 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| MERRICK GARLAND, Attorney General of | ) | |
| the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Vladimir Pavlov petitions for review of the denial of his application for naturalization by the United States Citizenship and Immigration Services (USCIS) ("Count I").[1] In the alternative, he seeks judicial review of USCIS's final decision under the Administrative Procedure Act, 5 U.S.C. § 706(2) ("Count II"). Before the court is respondents' motion for summary judgment. (Dkts. 27-28.) For the reasons set forth below, the motion is granted.

---

[1] Thus, the court has subject matter jurisdiction under 8 U.S.C. § 1421(c). Venue is proper in this district under § 1391(b).

## BACKGROUND[2]

Pavlov is a lawful permanent resident who immigrated from Bulgaria and has lived in the United States since 2015. Pavlov owns V & I Construction, which operates heavy machinery for construction work. After marrying an American citizen, he filed a Form N-400 application for naturalization with USCIS on June 28, 2018. USCIS conducted a first naturalization interview on August 2, 2019. During this first interview, Pavlov passed an English language test, whereby he demonstrated basic knowledge of the language. During the interview, Pavlov denied being involved with any past crimes or controlled substances, denied ever giving the U.S. government false, fraudulent, or misleading information or documents, and denied having ever lied to the U.S. government to gain immigration benefits. USCIS denied his application, finding that Pavlov failed to establish his "good moral character" by not paying a portion of his income taxes.

Pavlov filed a Form N-336 to appeal USCIS's decision and appeared for a second interview on January 13, 2022, where his counsel appeared telephonically. Afterwards, USCIS affirmed its initial denial of his N-400 application, concluding that Pavlov failed to establish his "good moral character" due to his unpaid taxes. Pavlov filed the instant lawsuit in August 2022, seeking this court's *de novo* review. In November 2022, the parties stipulated to this court's dismissal without prejudice, and USCIS agreed to rescind its N-336 decision. On January 10,

---

[2] The facts stated herein are based on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 submissions pursuant to N.D. Ill. R. 56.1(a)(2), (b)(2)-(3). At summary judgment, the court construes these facts in the light most favorable to the nonmovant. *Parker* v. *Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017). The court will address many, but not all, of the factual allegations in the parties' submissions as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). Pursuant to Federal Rule of Civil Procedure 56(c)(3), "[c]ourts may consider any evidence in the record when deciding summary judgment motions" and are not constrained to facts presented by parties' summary judgment submissions. *Johnson* v. *Stanonik*, No. 23-1562, 2023 WL 8641065, at *3 (7th Cir. 2023). The court has considered the parties' objections to the statements of fact and "includes in its opinion only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion" *Outley* v. *City of Chicago*, 354 F. Supp. 3d 847, 856 (N.D. Ill. 2019).

2

2023, USCIS interviewed Pavlov a third time. What transpired during and after this third interview forms the crux of the present dispute.

At the outset of his January 2023 naturalization interview and testifying under oath, Pavlov confirmed to the USCIS immigration services officer ("ISO") that he could understand and speak English. The ISO instructed Pavlov to let him know if he could not understand or was unsure of a question being asked of him. Nevertheless, evident from the transcript and undisputed by the parties is Pavlov's difficulty in understanding and answering some basic background questions related to his work history, property ownership, and past interactions:

> Q: Have you ever used any other names?
> A: No, never.
> ***
> Q: What is your highest level of education?
> A: Don't understand say again?
> Q: What level of education have you received?
> A: I work with my company two companies here V&I construction and Vega Chicago
> Q: Did you attend school?
> A: Don't go to school.
> ***
> Q: What did you study or focus on in your studies at University?
> A: The study at university? I do not understand.
> Q: Did you study science, math, literature?
> A: I do not understand.
> Q: What type of topic did you study when you obtained your Magister Degree[3]?
> A: Do not understand.
> Q: Do you know what an engineer is?
> A: No engineering, my study is not engineering.
> Q: What was your study then?
> A: The… The… Coast guard and economic financing.
> Q: Is that what you study for your Magisters, financing?
> A: Public Administration.

(Dkt. 25-1 at 81-82.)

---

[3] Pavlov testified that he attended university in Bulgaria and reached "Magister" level. He did not know the equivalent degree in the United States. (Dkt. 25-1 at 81).

After this initial sequence of questions, Pavlov rarely asked for clarification or for a question to be repeated. Rather than addressing the tax issues underlying the original denial, the ISO questioned Pavlov about involvement in the cultivation of marijuana and searches of properties in California alleged to have been connected with Pavlov. The ISO began by asking Pavlov broadly:

(1) whether he had ever given the U.S. government false, fraudulent, or misleading information;

(2) whether he had lied to the U.S. government to gain immigration benefits;

(3) whether he, his wife, Galina Neidalkova, or V & I Construction had ever been involved in the production, cultivation, processing, sales or distribution of marijuana;

(4) whether "any property owned or managed by [Pavlov], [his] wife, or V & I [had] ever been raided or searched by law enforcement"; and

(5) whether "marijuana [had] ever been found during any of these searches or raids."

(Dkt. 25-1 at 82-85.)

To each, Pavlov answered "no," or "[n]ever." (*Id.*) Pavlov represents, and the government does not dispute, that he had never been questioned during previous interviews about law enforcement searches of his property or alleged involvement in marijuana production.

The ISO read several federal statutes that prohibit actual or constructive possession of marijuana and asked Pavlov if he understood them. Pavlov said yes, he understood. Then, Pavlov answered questions about specific properties, starting with the "Panther Gap" property in which he owned a 15% stake. He testified that he had seen marijuana being grown by a medical marijuana collective that had paid him to specifically to fix a house on the property. To a question about the collective, he responded, "But when the police in 2012 and my cousin's

memorial stone over there. (After review witness wishes to clarify that police took all the paperwork from the collective during the search)." (Dkt. 25-1 at 85.)[4]

After the ISO described a county sheriff's report regarding a July 2012 search of the property, Pavlov testified, "My property found 980 probably. Should it say more than one thousand they would arrest me that is why they do not arrest me." (*Id*.) Pavlov further affirmed that the sheriff's report stated that some of the marijuana plants found during the search were his. Pavlov does not, however admit that he did possess these plants; he rather "believed that he would have been held responsible for them had there been more plants found on his property because they were growing on property he had ownership interest in." (Dkt. 36 ¶ 22.)

Next, the ISO asked about a property located at 6045 Wilder Ridge Road, where Pavlov's company was located. To whether it had been searched, Pavlov answered, "Yeah, 2020 come and search probably may come to search over there. I am here in Chicago." (Dkt. 25-1 at 86.) The ISO then told Pavlov that several weapons, greenhouses, more than 1,000 marijuana plants, and more than $500,000 were found during a 2020 search of V & I's office and two adjoining properties. Pavlov admitted to having a copy of a police report related to the search but denied that marijuana was found on his property: "My property they never grown marijuana there have never been any property."[5] (*Id*.) Pavlov denied USCIS's allegations that he or his company owned or operated a third property, 4149 Wilder Ridge Road, that was searched in November 2018.[6]

---

[4] This appears to be a note the witness added to the transcript after the interview.

[5] While Pavlov maintains that he was not shown the records pertaining to this search warrant Pavlov confirmed that he had a copy of the May 2020 police report.

[6] USCIS relies on newspaper articles, including one apparently quoting an affidavit from an FBI agent in a separate criminal proceeding, to connect Pavlov to the search, but the court disregards these

The ISO finished the interview with broad questions related to marijuana possession and manufacturing. Pavlov denied each:

> Q: On any occasion, did you ever possess marijuana?
>
> Q: On any occasion, did you knowingly or intentionally manufacture, distribute, or dispense marijuana, or possess marijuana with intent to manufacture, distribute, or dispense it?
>
> Q: On any occasion, did you knowingly open, lease, rent, use, or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance?
>
> Q: On any occasion did you manage or control any place, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance?

(Dkt. 25-1 at 89.)

At the end of the interview, Pavlov affirmed that he understood all the questions asked of him, took the opportunity to review his sworn statement with counsel, and clarified only that "he is sometimes called Vlado." (*Id*.)

Weeks after the interview, USCIS rescinded its July 2022 N-336 denial, informed Pavlov of its intent to redetermine its denial of the N-400 and sent a Notice of Intent to Deny ("NOID") his application on the basis that he provided false testimony during his third interview. Pavlov responded to the NOID and included a letter he submitted to the Humboldt County Sheriff's Department seeking to reclaim items taken during the 2012 search of Panther Gap as well as a copy of the 2020 search warrant for 6045 Wilder Ridge Road. Pavlov has never been charged with or convicted of any crime.

---

newspaper articles as they contain inadmissible hearsay. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (holding newspaper articles were hearsay and inadmissible for purposes of summary judgment.) USCIS points to no other evidence to substantiate the agent's affidavit averring that Pavlov or his company owned or operated the 4149 Wilder Ridge Road property. Thus, the court concludes for the purpose of reviewing USCIS's motion that he did not.

USCIS denied his N-400 naturalization application again on the basis that Pavlov had failed to demonstrate "good moral character," because he provided false testimony during the January 2023 interview.

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lord* v. *Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court does not at this juncture "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson* v. *Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted). When deciding a motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to the nonmovant. *Parker* v. *Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255).

### B. Standard of Review for Actions Brought Under 8 U.S.C. § 1421(c)

Under 8 U.S.C. § 1421(c), district courts review denied applications for naturalization *de novo*. *O'Sullivan* v. *U.S. Citizenship & Immigration Servs.*, 453 F.3d 809, 812 (7th Cir. 2006) ("Congress specifically calls for *de novo* review in naturalization cases, while ordering great deference in other immigration contexts.") District courts must maintain strict compliance with statutory requirements for naturalization, *Fedorenko* v. *U.S.*, 449 U.S. 490, 506 (1981), as they do not have the equitable authority to naturalize applicants who are ineligible for naturalization

7

as a matter of law. *INS* v. *Pangilinan*, 486 U.S. 875, 885 (1988). Although it is Pavlov's burden to establish his eligibility for naturalization, *see Berenyi* v. *District Director, Immigration & Naturalization Services,* 385 U.S. 630, 636 (1967), at summary judgment, "he needs only to raise a fact question to survive summary judgment." *Bijan* v. *United States Citizenship & Immigration Services*, 900 F.3d 942, 945 (7th Cir. 2018).

## ANALYSIS

Whether Pavlov established "good moral character" for naturalization requires the court to answer two questions: whether Pavlov testified falsely during his naturalization interviews and, if so, whether he testified falsely with the subjective intent to obtain naturalization benefits. Genuine issues of material fact preclude the court's ability to conclude that he provided false testimony during either his 2019 or 2022 interviews.

### A. Good Moral Character

Under the Immigration and Nationality Act, an applicant seeking to naturalize must demonstrate "good moral character" during the relevant statutory period[7] prior to filing the application for naturalization. 8 U.S.C. § 1430(a); 8 C.F.R. § 316.10. In this case, this period begins June 29, 2018. (*See* Dkt. 28 at 6.) If an applicant "has given false testimony for the purpose of obtaining immigration or naturalization benefits" during the relevant statutory period, then he or she is deemed not to be of good moral character. *Kungys* v. *United States*, 485 U.S. 759, 779 (1988) (citing 8 U.S.C. § 1101(f)(6)). "Testimony" under 8 U.S.C. § 1101(f)(6) is "limited to oral statements made under oath." *Kungys*, 485 U.S. at 780. And the false testimony at issue need not be material to disqualify an applicant from demonstrating good moral character,

---

[7] Pavlov cites 8 U.S.C. § 1427, which imposes a statutory term beginning five years before an application is filed. The court accepts the government's view that 8 U.S.C. § 1430(a) applies to persons seeking to naturalize on the basis of their status as spouses of U.S. citizens.

as long as the applicant had the subjective intent to deceive. *Id.* at 789-780; *see also United States* v. *Salem*, 496 F. Supp. 3d 1167, 1179 (N.D. Ill. 2020) (noting that courts fail to find good moral character based on minor lies); *Tinoco* v. *Cioppa*, 2017 WL 3895564, at *5 (N.D. Ill. 2017) (collecting cases).

In *Bijan*, the Seventh Circuit found that when an applicant knowingly provided false testimony during the course of an immigration interview under oath, that applicant had the intent to obtain an immigration benefit. *Bijan*, 900 F.3d at 946. It reasoned that "[t]he undisputed facts show that [the applicant] was aware of the misrepresentation on his visa application and thus that he intended to obtain an immigration benefit—naturalization—by denying that he had made it." *Id. See also Kaibanda* v. *United States Citizenship & Immigr. Serv.*, No. 21 CIV. 5953 (JPC), 2022 WL 2195345 at *7 (finding that applicant "intended to obtain an immigration benefit when he affirmed, untruthfully [during his interview], that he had never given false information or fraudulent documentation to a U.S. Government official.") In effect, the Seventh Circuit has merged the "false testimony" and "subjective intent" elements outlined in *Kungys*, 485 U.S. at 780. If a jury were to find that Pavlov did in fact knowingly provide false testimony during his interview, then the subjective intent requirement of 8 U.S.C. § 1101(f)(6) would be met.

The Supreme Court has cautioned, however, that "[i]t is only dishonesty accompanied by this precise intent that Congress found morally unacceptable. Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character." *Kungys*, 485 U.S. at 780 (citation omitted); *Plewa* v. *Immigration and Naturalization Service*, 77 F. Supp. 2d 905, 912 (N.D. Ill. 1999) ("[I]t seems incongruous that Congress would consider an

innocent mistake, misinterpretation, or incorrect statement as grounds to disqualify an otherwise upstanding person for American citizenship when the speaker had no deceitful intent.").

The parties agree that Pavlov was under oath during both his 2019 and 2023 interviews, the latter of which resulted in a sworn written statement that both he and his attorney signed. The parties only dispute whether Pavlov gave false testimony with the subjective intent to obtain an immigration benefit. Pavlov's primary argument is that he did not understand English well enough to respond to the questions about law enforcement searches of his property or the legality of the presence of marijuana on his properties. He also argues that he had no notice that the interview was to be about his marijuana-related activities rather than payment of taxes. And he objects that USCIS's decision relies on information that was not addressed at the interview, denying him any opportunity to respond.

No doubt, springing questions on an unexpected topic was, if not unfair, certainly challenging for Pavlov and his attorney. But now that the case is in court, Pavlov has had the opportunity to carry his burden to show he is of good moral character. Unfortunately, the court has little in Pavlov's favor to work with. Pavlov does not specifically state what questions he did not understand at the interviews and how he would have answered differently had he better understood. For example, what he would have answered differently had he understood the federal statutes the ISO recited is unclear. And he provides the court little else to corroborate his statements under oath, such as a lease with the claimed collective for the Panther Gap property, a reason why he would have been paid $30,000 to repair a home on the property that the collective did not own, or any evidence that V & I Construction had performed construction work for other clients, affidavits of its employees, and such.

1.  **2019 Interview**

USCIS claims that Pavlov provided false testimony during his 2019 interview when he summarily answered "no" to questions about past crimes, involvement with controlled substances, as well as about previously misleading the government. USCIS appears to maintain that, because "Pavlov had already engaged in the manufacturing of marijuana in June 2012 on his Panther Gap property," his 2019 testimony that he had never committed a crime for which he was not arrested was false.[8] Pavlov denies that he was "involved in the cultivation of marijuana" and argues, rather, that he leased land to a medical marijuana collective that he believed was not engaging in any criminal conduct. But he also admitted in the 2023 interview that more than half of the marijuana found in the sheriff's 2012 search was found on the property, and he knew that had he had a few more plants he could have been arrested. He also indicated that the officers threw the plants away. These admissions certainly indicate that Pavlov knew in 2019 that a significant amount of marijuana had been previously cultivated on his property and that he was aware that it was illegal.

2.  **2023 Interview**

As Pavlov's counsel frequently points out, Pavlov's testimony was at times inconsistent during the 2023 interview and the ISO's questions were at times compound or complex, such that one with limited English language ability might not fully or immediately understand them.

---

[8] Pavlov's argument that California had legalized the cultivation of marijuana for medical uses is unavailing. While California had passed the Compassionate Use Act in 1996, which permitted the cultivation of marijuana for medical purposes by patients and caregivers, neither party has submitted evidence of whether the medical marijuana collective Pavlov refers to was covered under this law. Moreover, whether California has legalized marijuana is irrelevant to a federal action—where marijuana remains a controlled substance. *See Reimers* v. *USCIS*, 584 F. Supp. 3d 936, 946 (E.D. Wash. 2022) (granting summary judgment for USCIS in denying the plaintiff's naturalization application because, inter alia, "Federal law makes the distribution of marijuana, among other activities, illegal. Admission to violation of such a law serves as a statutory bar to a finding of good moral character for naturalization applications" (citing 21 U.S.C. § 841(a)).

But Pavlov does not specify what he did not understand. His responses indicate the contrary, that he in fact did understand the questions being asked of him.

When asked about the Panther Gap property, Pavlov testified that a medical marijuana collective had been cultivating marijuana on the property and appeared to allude to a 2012 police search of the property ("[b]ut when police in 2012") *before* the ISO described law enforcement reports about the search. After the ISO described the search, Pavlov admitted that agents found about 980 plants on his property. Similarly, with respect to the 6045 Wilder Ridge property, Pavlov testified that he knew about a 2020 search of the property, once again *before* the hearing officer discussed a law enforcement report on the search.

Pavlov contends that these admissions were retractions of earlier denials once he fully understood the ISO's initial questions about the specific properties. Even if credited as retractions, Pavlov continued to deny that marijuana was found on properties with which he was connected, even though he admitted to marijuana being seized from his property. Near the end of the interview, the ISO asked Pavlov whether "he ever possess[ed] marijuana." Pavlov answered "no." (Dkt. 25-1 at 89.) He also answered "no" to the following:

> Q: On any occasion, did you knowingly open, lease, rent, use, or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance?
>
> Q: On any occasion did you manage or control any place, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance?[9]

(*Id.*)

---

[9] The ISO confirmed that Pavlov knew and understood that marijuana is a Schedule I controlled substance that remains "unlawful under federal law to knowingly or intentionally possess[.]" (Dkt. 25-1 at 83-84.) Pavlov answered that he understood a number of questions regarding the illegality of marijuana, including its constructive possession.

Pavlov's statements about leasing land to a marijuana-growing collective make the answer to the first question demonstrably false. There is no genuine issue of material fact that Pavlov testified falsely that his properties had never been used for growing marijuana. As such, the motion must be granted.

**B. APA Claim**

Pavlov alternatively asks the court to find that USCIS's decision was "arbitrary, capricious, an abuse of discretion and not in accordance with the law" under the Administrative Procedures Act ("APA"). 5 U.S.C. § 706(2). The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." § 704. Here, because Pavlov has an alternative adequate remedy under Section 1421(c), for *de novo* review of USCIS's denial of his naturalization application, his APA claim is redundant and inappropriate. *Heslop* v. *Att'y General of U.S.*, 594 F. App'x 580, 584 (11th Cir. 2014) ("[t]he APA does not authorize judicial review 'that adds to the sweeping *de novo* review' that the INA provides" under 8 U.S.C. § 1421(c)) (internal quotations omitted); *see also Saleh*, 2023 WL 5671149, at *9 ("Because there is an adequate remedy available, this [c]ourt does not have jurisdiction over [the plaintiff's] APA claim.")

## CONCLUSION AND ORDER

For the foregoing reasons, respondents' motion for summary judgment (dkts. 27-28) is granted. This is a final judgment. Case is terminated.

Date: September 30, 2024

_Joan H. Lefkow_
U.S. District Judge Joan H. Lefkow